UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


FREDRICK C. DERDA,          )
                                   )
        Plaintiff,           )
                                   )
       vs.                 )         Case No. 4:09CV01847 AGF
                                   )
MICHAEL J. ASTRUE,          )
Commissioner of Social Security,   )
                                   )
        Defendant.       )


## MEMORANDUM AND ORDER

This action is before the Court for judicial review of the final decision of the

Commissioner of Social Security denying Plaintiff Fredrick C. Derda's application for

disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 -

434. For the reasons set forth below, the decision of the Commissioner shall be affirmed.

Plaintiff, who was born on July 27, 1952, filed for benefits on October 30, 2007,

at the age of 55, alleging a disability onset date of October 30, 2007, due to depression

and obesity. After Plaintiff's application was denied at the initial administrative level on

February 6, 2008, he requested a hearing before an Administrative Law Judge ("ALJ")

and such a hearing was held on April 2, 2009, at which Plaintiff and a vocational expert

("VE") testified.

By decision dated May 29, 2009, the ALJ found that Plaintiff could not perform

his past relevant work, but that, given his age, education, work experience, and residual

functional capacity ("RFC"), there were other jobs that he could perform, and therefore,

he was not disabled under the Social Security Act. Plaintiff's request for review by the Appeals Council of the Social Security Administration was denied on September 25, 2009. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's decision was not based upon substantial evidence because in determining Plaintiff's RFC, the ALJ failed to include functional restrictions caused by Plaintiff's depression, improperly failed to credit the opinion of Plaintiff's treating psychiatrist (Saad Khan, M.D.), failed to include nonexertional limitations relating to Plaintiff's obesity, and erred in determining Plaintiff's credibility by failing properly to account for the side effects of Plaintiff's medications.

## BACKGROUND

### Work History and Application Form (Tr. 90-104; 118-20, 126-131.)

Plaintiff reported that he worked as a printing pressman from 1973 to October 30, 2007, his alleged disability onset date and the date that he was fired from his job. In this position, Plaintiff worked 40 hours per week, at the rate of $16.02 per hour. He noted that this work required using machines and tools; technical knowledge and skills; writing and completing reports; walking, standing, reaching, kneeling, crouching, sitting, stooping, handling big and small objects for at least seven hours per day. Plaintiff indicated that the heaviest weight he lifted was 50 pounds, and that he frequently lifted 25 pounds.

Plaintiff indicated that he had previously worked as a black jack dealer from March 1993 to November 1993, and from July 1994 to August 1994, for 40 hours per

week, at a rate of $5.15 per hour.  He had also worked as a subcontractor, picking up medical specimens for delivery, from January 1997 to May 1997, for 40 hours per week, at a rate of $10.00 per hour.

**<u>Medical Records</u>**

Medical records beginning in 1999 document various problems that Plaintiff had, including back and neck pain, arthritic pain, asthma, mild chronic pulmonary disease ("COPD"), hypertension, sleep apnea, and some heart problems.

On June 2, 2003, Plaintiff's treating physician, Martin Walsh, M.D., noted that Plaintiff requested anti-depressants, stating that he felt angry and "down in [the] dumps." Dr. Walsh prescribed Prozac, which he continued to prescribe through at least 2006.  (Tr. 358-59, 361, 366-68, 386, 390, 392.)

On October 13, 2004, when Plaintiff visited Dr. Walsh for his yearly physical, Dr. Walsh indicated that Plaintiff weighed 267 pounds and had been unable to lose weight. (Tr. 381.)

On November 7, 2005, Plaintiff reported to Dr. Walsh that he was "tired all the time," and had problems with sleep, depression, and stress.  (Tr. 371-72.)

On July 2, 2007, Plaintiff visited Patrick Sandiford, M.D., a pulmonary specialist he had been seeing since May 2003.  Dr. Sandiford recommended that Plaintiff increase his breathing and COPD medication, but noted that a significant amount of Plaintiff's breathing issues were due to deconditioning and obesity.  (Tr. 160.)  On July 13, 2007, Dr. Sandiford indicated that Plaintiff's obstructive sleep apnea was successfully re-

titrated with nasal continuous positive airway pressure ("CPAP") therapy. He also recommended additional weight loss to Plaintiff. (Tr. 312-13.)

On October 2, 2007, Plaintiff visited Leslie Tharenos, M.D., complaining of head, neck, back and right shoulder pain, which he had experienced for at least five to six years, with no relief after chiropractic treatment and steroid injections. Dr. Tharenos noted that Plaintiff had normal posture, gait, and heel to toe walking, diagnosed Plaintiff with pain in the back and shoulder, and prescribed Relafen. (Tr. 282-97.)

On November 26, 2007, Plaintiff completed a Function Report in conjunction with his application for disability benefits. He described the symptoms that kept him from working as including breathlessness, neck and back pain, headaches, lightheadedness, heel and feet pain, ankle swells from standing, and sleepiness. He reported that walking, going up steps, lifting, and bending, all made these symptoms worse. When he went grocery shopping, he reported that he leaned on the cart, usually got very tired, and his neck and back would hurt. (Tr. 108-16.)

On January 23, 2008, Inna Park, M.D., a state agency examiner, performed a consultative examination. Plaintiff reported that he could walk approximately 100 feet before having to stop due to shortness of breath and back pain, could climb one flight of steps before needing to rest, could stand for about 15 minutes at a time, could sit with frequent shifting for about two hours at a time, and stated that chores such as lawn mowing took longer and required breaks. He also reported that the CPAP machine improved his sleep quality and daytime fatigue, but that he still did not have optimal sleep. Dr. Park noted Plaintiff's morbid obesity and that he had normal speech, hearing

and affect. She also noted that he had a negative straight leg raise test, and was able to move around easily, get on and off of the examination table, and walk on his heels and toes without difficulty. She diagnosed COPD with stable symptoms, sleep apnea with some incomplete resolutions, arthritis, right shoulder injury, right ankle chronic pain, and untreated hypertension. (Tr. 210-13.)

On February 1, 2008, Plaintiff visited Dr. Walsh regarding "overall health." Dr. Walsh noted Plaintiff's asthma, depression, and sleep apnea. (Tr. 351-52.)

On February 5, 2008, Despine Coulis, M.D., a non-examining state agency consultant, prepared a Physical RFC Assessment of Plaintiff. Dr. Coulis indicated that Plaintiff could lift or carry 20 pounds occasionally and ten pounds frequently; stand or walk for six hours in an eight-hour work day; sit for six hours in an eight-hour work day; occasionally stoop, kneel, crouch, crawl, and climb ramps or stairs. Dr. Coulis also indicated that Plaintiff was unlimited in his ability to push or pull, subject to his restrictions in carrying and lifting; could not climb ladders, ropes, or scaffolds; and should avoid concentrated exposure to extreme heat, humidity, and hazards. (Tr. 218-20.)

On May 29, 2008, Plaintiff returned to Dr. Sandiford, stating that the CPAP titration was controlling his sleep apnea and that he was not having problems with excessive daytime sleepiness. Plaintiff also reported that he was exercising on a regular basis, and doing well on his current inhalers. Dr. Sandiford noted that Plaintiff was "free of wheezes" on examination, and continued Plaintiff's use of the CPAP device and an inhaler. (Tr. 306-08.)

On July 11, 2008, Plaintiff visited Saad Khan, M.D., a psychiatrist, complaining that he was feeling anxious, depressed, and irritable. Dr. Khan noted Plaintiff had an anxious affect, a nervous mood, and no suicidal ideation. He diagnosed Plaintiff with "dysthymia/major depressive disorder," reduced Plaintiff's Prozac dosage, and prescribed Cymbalta. (Tr. 318-20.) On August 14, 2008, Plaintiff returned to Dr. Khan, who noted that Plaintiff had a nervous mood and anxious affect, as well as signs of a depressed mood, moderate difficulty with concentration and fatigue, but normal sleep activity. Dr. Khan recommended individual psychotherapy and medication management. (Tr. 314-15.)

On September 9, 2008, Dr. Sandiford completed a Medical Source Statement ("MSS") for Plaintiff. Dr. Sandiford indicated that Plaintiff was limited to standing for four hours in an eight-hour work day; walking for one to two hours in an eight-hour work day; and was unlimited with respect to sitting. He also indicated that Plaintiff could lift five pounds frequently and ten pounds occasionally, and could carry five pounds frequently and 20 pounds occasionally. He noted that Plaintiff had no visual or auditory limitations, or issues with manipulating objects or balance, and could continuously reach above his head, and occasionally stoop. Plaintiff could also occasionally tolerate exposure to odors or dust, but not exposure to noise. Dr. Sandiford noted that Plaintiff did not have a medically determinative impairment expected to produce pain. (Tr. 228-30.)

On September 10, 2008, Plaintiff again followed up with Dr. Khan, who continued to recommend therapy and medication. (Tr. 316-17.) On September 24, 2008, Plaintiff

visited Dr. Walsh, complaining of abdominal pain, and continuing issues with depression and sleep. (Tr. 337-38.)

On October 15, 2008, Dr. Khan completed a Mental MSS for Plaintiff, noting a disability onset date of 2003 and a diagnosis of dysthymic disorder and major depressive disorder. He indicated that Plaintiff was extremely or markedly limited in all areas of daily living and social functioning, as well as in almost all areas of concentration, persistence, or pace. Dr. Khan indicated that Plaintiff had experienced four or more episodes of decompensation in the past year that had lasted at least two weeks, and that Plaintiff's symptoms caused him to be absent from work three times per month or more, and to be late to work once per month or less. In the narrative section, Dr. Khan noted that Plaintiff had been forthright and truthful in his history, and that there was no evidence of malingering or symptom exaggeration. (Tr. 232-35.)

On November 9, 2008, Plaintiff began treatment at the Weight Loss Institute. (Tr. 557-75.)

Plaintiff returned to Dr. Khan on November 19, 2008 and January 20, 2009. Dr. Khan noted no change in Plaintiff's psychiatric condition and prescribed Effexor and Wellbutrin. (Tr. 606-07.)

On December 17, 2008, Dr. Sandiford completed another MSS. Dr. Sandiford indicated that Plaintiff had no limitations with respect to sitting, could occasionally lift or carry 10 pounds, could stand for two to four hours in an eight-hour work day; could walk for 30 minutes in an eight-hour work day, could occasionally stoop, and could continuously reach above his head. Dr. Sandiford also noted that Plaintiff's impairments

would cause him to miss or be tardy to work one day per month or less; and would cause him to need to lie down or take a nap during an eight-hour workday; and to take more than three breaks during an eight-hour workday, due to fatigue, obesity, and shortness of breath. (Tr. 236-39.)

On March 4, 2009, Plaintiff underwent laparoscopic placement of an adjustable gastric restrictive device. (Tr. 529.) On March 11, 2009, Plaintiff reported a 9.5 pound weight loss on a post-operative visit, and stated that he was happy about the weight loss and tolerating the treatment well. (Tr. 556, 558.)

On March 17, 2009, Dr. Khan noted that Plaintiff continued to have a depressed mood and nervous affect, and recommended psychotherapy and medication management for two months. (Tr. 604-05.) He also completed another Mental MSS, noting an onset date of June 2008. Dr. Khan indicated that Plaintiff was extremely limited in his ability to cope with normal stress, behave in an emotionally stable manner, maintain reliability, and accept instructions/responses to criticism. Dr. Khan also noted extreme limitations in all areas related to Plaintiff's concentration, persistence and pace, except for a moderate limitation in his ability to make simple and rational decisions. Dr. Khan indicated that Plaintiff was markedly limited in his ability to function independently and to interact with strangers; and was moderately limited in his ability to adhere to basic cleanliness, relate to others, ask questions/request assistance, and maintain socially acceptable behavior. Dr. Khan noted that during an eight-hour workday, Plaintiff was limited to two hours or less of applying commonsense understanding in carrying out instructions, and of interacting appropriately with coworkers, supervisors, or the general public. He also

noted that Plaintiff would miss work three or more times each month, and be late for work three or more times each month. (Tr. 600-03.)

On March 30, 2009, Plaintiff reported that he was taking the following prescription medications: Bupropion SR and Effexor XR for his anxiety and depression, Advair 250 and Combiavient for his breathing, Lipitor for his cholesterol, Toprol for his heart, Dicyclomine for his pain, Levothyroxine for his thyroid, and Triamterene/HCTZ for water retention. He was also using a CPAP machine for his sleep apnea, and taking Advil and Excedrin for pain. (Tr. 142-43.)

On April 14, 2009, Dr. Sandiford completed another MSS, with restrictions similar to his December 2008 MSS. (Tr. 626-29.)

**Evidentiary Hearing of April 2, 2009 (Tr. 24 - 41.)**

Plaintiff, who was represented by counsel, testified that he was 56 years old, married with two children, ages 11 and 20, had a 12th grade education, was 5'9" tall, and weighed 300 pounds. His wife, who was disabled with multiple sclerosis, was receiving $1,000 per month in disability benefits. He was receiving $1,200 per month in unemployment benefits, which he had received "on and off" since October 30, 2007, and stated that he had not "been told that [he] couldn't [work] really." Plaintiff stated that he was aware that when he applied for unemployment compensation benefits, he made that representation that he was able-bodied, but explained that he "didn't figure he was lying because [he] didn't know how this work[ed]." He thought he deserved the compensation because he had "paid into the system" in his working years. Plaintiff also stated that he had read the Social Security Application and the unemployment compensation application

several times, but didn't know how the forms were interpreted, so he "just went ahead and did it" because he needed the money.

Plaintiff testified that he had filed for disability benefits within one week of getting fired from his previous job because, at the time, he believed that he would not be able to find work and was already experiencing significant pain.

Plaintiff testified that he had first been treated for depression approximately three to four years earlier, by Dr. Sandiford, who had prescribed Prozac. The Prozac stopped helping him, so he was referred to a psychiatrist approximately nine months before the hearing. He now visited the psychiatrist on a monthly basis, and visited his physician every other month.

Plaintiff testified about his COPD and neck and back pain. He had tried a variety of pain medications, but had to watch what he took because they irritated his stomach and exacerbated his irritable bowel syndrome.

The VE reviewed Plaintiff's work history, and testified that Plaintiff's work as a printing press operator had provided Plaintiff with transferable skills for jobs in the light exertional level,[1] that required little or no vocational adjustment. The VE noted that there

---

[1]    "Light work" is defined in 20 C.F.R. § 404.1567(b) as work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying of up to ten pounds; and that might require a good deal of walking or standing, sitting most of the time, and some pushing and pulling of arm or leg controls. Social Security Ruling (SSR) 83-10, 1983 WL 31251, at *6, elaborates that the full range of light work requires standing or walking, off and on, for a total of approximately six hours of an eight hour work day, while sitting may occur intermittently during the remaining time; that the lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping; and that many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk.

were offset press jobs related to screen printing at the light exertional level, which were available in significant numbers in the local and national economy. This job would require Plaintiff to remain at the machine; would require standing, moving and walking; had no sit/stand option; and would require more than four hours of standing in an eight-hour workday. The VE testified that Plaintiff's transferable skills would include the subject matter of the printing process, the similarity of printing equipment operation, and the procedures involved in printing, but these skills would not transfer to a sedentary position, unless Plaintiff's past printing had involved a computer-operated press. Plaintiff testified that he had never worked at a computerized station. Plaintiff also testified that the printing vapors affected his breathing, causing him to hyperventilate.

**ALJ's Decision of May 29, 2009 (Tr. 15 - 23.)**

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2012, and had not engaged in substantial gainful activity since October 30, 2007, his alleged disability onset date. The ALJ determined that Plaintiff suffered from the following severe impairments: morbid obesity, chronic obstructive pulmonary disease, and osteoarthritis; he found that Plaintiff's depression did not cause more than minimal limitation in his ability to perform basic mental work activities, and was therefore nonsevere. However, the ALJ found that none of these impairments, singly or in combination, met or equaled a deemed-disabling impairment listed in the Commissioner's regulations.

After consideration of the record, the ALJ found that Plaintiff had the RFC to perform the full range of light work. Citing Polaski v. Heckler, 739 F.2d 1321 (8th Cir.

11

1984), the ALJ found the preponderance of the medical and other evidence to be inconsistent with Plaintiff's allegation of disability. The ALJ noted that Plaintiff's allegations concerning the intensity, persistence, and limiting effects of his symptoms were not credible to the extent that they were inconsistent with the ALJ's RFC determination.

The ALJ determined that "[e]ither by itself or in combination with his other impairments, his arthritis or obesity could not reasonably be expected to rule out" Plaintiff's ability to perform light work. The ALJ summarized Dr. Sandiford's three MSS opinions, that indicated that Plaintiff was more limited than would allow him to perform light work, but accepted them "only to the extent that they limited Plaintiff to the performance of the full range of light work." In support of this conclusion, the ALJ pointed to Plaintiff's own description of the work he did as a pressman from May 2003 until October 2007, as noted above. The ALJ also noted that Dr. Sandiford's restrictions that exceeded the ability to perform light work were not supported by Dr. Sandiford's pulmonary function tests and clinical examinations, which according to the ALJ were "fairly benign."

In evaluating Plaintiff's depression, the ALJ stated that he gave no weight to Dr. Khan's findings of marked and extreme limitations on Plaintiff's mental capacity for working, contained within his October 15, 2008 and March 17, 2009 MSS, because Dr. Khan provided no medical support for these conclusions and the conclusions were inconsistent with Dr. Khan's treatment records. The ALJ noted that Dr. Khan's treatment records showed slight to moderate problems at worst, entitling Dr. Khan's treatment

records to more weight than the "conclusory documents prepared exclusively for benefit/litigation purposes."

The ALJ also noted that Plaintiff's subjective findings noted in Dr. Khan's treatment notes were consistently rated as normal, slight and sometimes moderate, and that Dr. Khan's assessment of marked and extreme limitations on Plaintiff's mental capacity was "wildly at odds" with the customary meaning of marked and extreme limitations. The ALJ particularly noted that Dr. Khan indicated that Plaintiff had been subject to these marked and extreme limitations since 2003, yet Plaintiff had worked at the substantial gainful activity level from 2003 to 2007.

Finally, the ALJ stated that Plaintiff's utilization of his layoff date as his alleged disability onset date greatly detracted from the credibility of his allegations because there was no medical evidence documenting a significant medical deterioration at the time of his layoff. The ALJ also noted that he was troubled by Plaintiff's inconsistent actions with regards to his receipt of unemployment benefits during his disability application process. To receive unemployment benefits, Plaintiff had to certify to the state that he was ready, willing, and able to work. However, in order to be able to receive disability benefits, Plaintiff must be unable to work at any job. The Plaintiff was telling the state he could work, at the same time he was telling the federal government he could not work, and his assertions therefore varied "with who is paying him on what basis," which the ALJ found greatly detracted from the credibility of Plaintiff's allegations. Thus, the ALJ found that Plaintiff's ability to work was limited by his medically determinable impairments and resulting symptoms, but not to the extent alleged.

The ALJ found that Plaintiff could not perform his past relevant work, but had

acquired skills from that work that were transferable to other occupations with jobs

existing in significant numbers in the economy and required little or no vocational

adjustment.  Relying on the VE's testimony that a person of Plaintiff's age, education,

work experience, and RFC for light work, could perform jobs such as light offset press

worker, which were available in significant numbers in the national economy, the ALJ

determined that Plaintiff was not disabled.  The ALJ reached the same conclusion by

application of the Medical Vocational Guidelines, 22 C.F.R. Part 404, Subpart P,

Appendix 2.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court "must affirm

the Commissioner's decision so long as it conforms to the law and is supported by

substantial evidence on the record as a whole."  Reed v. Barnhart, 399 F.3d 917, 920 (8th

Cir. 2005) (citation omitted).  This "entails 'a more scrutinizing analysis'" than the

substantial evidence standard.  Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th

Cir. 1989)).  The court's review "'is more than an examination of the record for the

existence of substantial evidence in support of the Commissioner's decision'"; the court

must "'also take into account whatever in the record fairly detracts from that decision.'"

Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)).

"Reversal is not warranted, however, 'merely because substantial evidence would have

supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)).

> It is not the role of [the reviewing] court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo. If, after review, [the court] find[s] it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the denial of benefits.

Wiese v. Astrue, 552 F.3d 728, 730 (8th Cir. 2009) (citations omitted).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A); Barnhart v. Walton, 535 U.S. 212, 217-22 (2002). The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a). A special technique is used to determine the severity of mental disorders. This technique calls for rating the claimant's degree of limitations in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Id. § 404.1520a(c)(3).

If the claimant does not have a severe impairment or combination of impairments that meets the duration requirement, the claim is denied. If the impairment is severe and

meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in the Commissioner's regulation, 20 C.F.R. Pt. 404, Subpt. P, App. 1. If so, the claimant is conclusively presumed to be disabled. Otherwise, the Commissioner asks at step four whether the claimant has the residual functional capacity to perform his past relevant work, if any. If the claimant can return to past relevant work, the claimant is not disabled. Otherwise, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant has the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Commissioner's Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment. Where a claimant cannot perform the full range of work in a particular category due to nonexertional impairments such as depression, the Commissioner cannot carry the step-five burden by relying on the Guidelines, but must consider testimony of a vocational expert as to the availability of jobs that a person with the claimant's profile could perform. Baker v. Barnhart, 457 F.3d 882, 888 n.2, 894-95 (8th Cir. 2006).

**Plaintiff's Mental Impairment**

Plaintiff first argues that the ALJ erred by not finding at step two that his depression was severe. A "severe impairment is defined as one which 'significantly limits [the claimant's] physical or mental ability to do basic work activities.'" Pelkey v. Barnhart, 433 F.3d 575, 578 (8th Cir. 2006) (quoting 20 C.F.R. § 404.1520(c)) (alteration in original). Conversely, an impairment is not severe if it "amounts only to a slight abnormality that would not significantly limit the claimant's ability to work," i.e., "[it] would have no more than a minimal effect on the claimant's ability to work[.]" Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). "Severity is not an onerous requirement . . . , but it is also not a toothless standard . . . ." Id. at 708 (internal citations omitted). And, as noted above, it is the claimant's burden to establish that his impairment, or combination of impairments, is severe. Id. at 707.

There is substantial evidence in the record to support the ALJ's decision that Plaintiff presented no convincing evidence that, as a result of his depression, he had more than a mild limitation in the functional areas of activities of daily living, social functioning, and concentration, or that he has experienced any episodes of decompensation that have last for an extended duration. (Tr. 18.) In January 2008, Dr. Park noted that Plaintiff had a normal affect. (Tr. 212.) In July 2008, Dr. Khan diagnosed Plaintiff with "dysthymia/major depressive disorder,"[2] which indicates that

---

[2]    Dysthymic disorder "is characterized by chronic, less severe depressive symptoms that have been present for many years." See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV) 348 (4th Ed. 1994).

Plaintiff's symptoms were "less severe depressive symptoms." (Tr. 320.) Dr. Khan's treatment records from late 2008 and early 2009 also indicate that Plaintiff's subjective findings, including Plaintiff's mood and spirits, were never rated higher than slightly or moderately impaired, despite having a "marked" option.[3] There was no evidence in the record that Plaintiff had been hospitalized due to his psychiatric condition.

Plaintiff argues that the ALJ erred in disregarding Dr. Khan's October 15, 2008 and March 17, 2009 MSS opinions because the ALJ did not identify any specific inconsistencies between Dr. Khan's opinions and his treatment notes, and failed to address most of the other factors under 20 C.F.R. § 404.1527(d). The record indicates that Dr. Khan was Plaintiff's treating psychiatrist from July 2008 through at least March 11, 2009 (Tr. 232-34, 314-20, 604-15.) The weight to be given to a medical opinion is governed by a number of factors including the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the consistency of the source's opinion, and whether the source is a specialist in the area. 20 C.F.R. § 404.1527(d). The ALJ is to give a treating medical source's opinion on the issues of the nature and severity of an impairment controlling weight if such opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. at

---

[3] The Court notes that Plaintiff argues that the degree of symptoms reflected by the term "moderate," as used in Dr. Khan's treatment notes, differs from the degree reflected by the use of the term in Dr. Khan's MSS. However, Plaintiff has provided no legal or factual support for this argument. Therefore, the Court is not persuaded by this argument.

§ 404.1527(d)(2); <u>Medhaug v. Astrue</u>, 578 F.3d 805, 815 (8th Cir. 2009).

The record provides substantial evidence to support the ALJ's decision to give no weight to Dr. Khan's two MSS opinions indicating that Plaintiff had a marked or extreme limitation in most mental work-related areas. The record indicates that Dr. Khan's mental MSS opinions consisted of checkmarks and contained no explanation for his findings. (Tr. 232-35, 600-03.) An ALJ may discount a treating physician's MSS where the limitations listed on the MSS "stand alone," and were "never mentioned in [the physician's] numerous records or treatment," nor supported by "any objective testing or reasoning." <u>Reed v. Barnhart</u>, 399 F.3d 917, 921 (8th Cir. 2005) (citing <u>Hogan v. Apfel</u>, 239 F.3d 958, 961 (8th Cir. 2001) and <u>Strongson v. Barnhart</u>, 361 F.3d 1066, 1071 (8th Cir. 2004)); <u>see also</u> <u>Cain v. Barnhart</u>, 197 F. App'x. 531, 533-34 (8th Cir. 2006) ("A treating physician's checkmarks on an MSS form are conclusory opinions that may be discounted if contradicted by other objective medical evidence in the record.").

Dr. Khan's treatment records provide substantial evidence to support the ALJ's determination that they conflict with Dr. Khan's MSS opinions. As discussed above, Dr. Khan's treatment records indicate that Plaintiff's subjective findings, including Plaintiff's mood and spirits, were never rated higher than slightly or moderately impaired, despite having a "marked" option. (Tr. 604-15.) Additionally, in his October 2008 MSS, Dr. Khan indicated that Plaintiff had marked and extreme limitations since 2003, despite evidence in the record indicating that Plaintiff worked eight hour days, five days a week, from 2003 through October 2007. (Tr. 99, 234.)

Plaintiff's argument that the ALJ failed to address most of the other factors under 20 CFR § 404.1527(d) is misplaced. While an ALJ must consider all of the factors set forth in 20 CFR § 404.1527(d), he need not explicitly address each of the factors. See Paseka v. Comm'n of Soc. Sec., No. 1:09-CV-1073, 2011 WL 883701, at *2 (W.D. Mich. March 11, 2011) (finding the ALJ satisfied the procedural requirements of 20 C.F.R. § 404.1527(d) when he considered the evidence in accordance with the requirements and expressly addressed the supportability and consistency factors in detail); Ray v. Astrue, No. 3:09-cv-275, 2010 WL 2650718, at *7 (E.D. Tenn. July 2, 2010) (finding that the ALJ did not err in focusing only on the supportability and consistency factors to decide that the treating physician's opinion was not entitled to controlling weight); Wamsley v. Astrue, No. 09-cv-02811-CMA, 2011 WL 334454, at *6 (D. Colo. Jan.31, 2011) ("If a treating physician's opinion is not given controlling weight, the ALJ must 'give good reasons' and consider a list of regulatory factors. Though the ALJ must consider these factors, he need not discuss all of them."); McCoy v. Astrue, No. 4:09-cv-517-A, 2010 WL 5812954, at *4 (N.D. Tex. Dec. 16, 2010) (explaining that the ALJ must " 'consider' each of the factors set forth in section 404.1527(d) and articulate good reasons for its decision to accept or reject the treating physician's opinion," but that he "need not recite each factor as a litany in every case"); accord Bergner v. Astrue, No. 3:09-cv-242, 2010 WL 2710591, at *4 (N.D. Ind. July 7, 2010).

Finally, Plaintiff argues that the ALJ improperly disregarded Dr. Khan's MSS opinions on the basis that they were produced "exclusively for benefit/litigation

purposes."  The Court finds that this argument misstates the ALJ's position that "The treatment records showing slight to moderate problems at the worst are entitled to much more weight than the conclusory [MSS opinions] prepared exclusively for benefit/litigation purposes."  (Tr. 21.)  As discussed above, there is substantial evidence in the record supporting the ALJ's determination that Dr. Kahn's MSS opinions were inconsistent with his treatment notes, and were therefore properly disregarded.

Although an ALJ may not substitute his opinion for that of a physician, the ALJ may "'reject the opinion of any medical expert where it is inconsistent with the medical record as a whole.'"  Finch v. Astrue, 547 F.3d 933, 938 (8th Cir. 2008) (quoting Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002)).  As explained above, the ALJ was entitled to reject Dr. Kahn's opinion on the ground that it was inconsistent with the medical record as a whole.

The Court finds that there is substantial evidence in the records to support the ALJ's decision to disregard Dr. Khan's two MSS opinions, as well as to support the ALJ's determination that Plaintiff's depression was not severe.

**Effect of Obesity**

Plaintiff argues that the ALJ erred in his RFC determination, by failing to consider the nonexertional[4] limitations that arise from obesity.  Plaintiff argues that the ALJ never adequately explained how Plaintiff's morbid obesity, which the ALJ found to be a severe impairment, could only cause exertional limitations, with no nonexertional limitations.

---

[4] A nonexertional limitation is one that affects a claimant's ability to meet the demands of a job other than strength demands.  20 C.F.R. § 404.1569a(c).

A disability claimant's RFC is the most he can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1). In <u>McCoy v. Schweiker</u>, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." <u>Id.</u> at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" <u>Krogmeier v. Barnhart</u>, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. <u>Id.</u> As noted, an RFC is based on all relevant evidence, but it "remains a medical question" and "'some medical evidence must support the determination of the claimant's [RFC].'" <u>Id.</u> at 1023 (quoting <u>Hutsell v. Massanari</u>, 259 F.3d 7, 711 (8th Cir. 2001). The ALJ is therefore required to consider at least some supporting evidence from a medical professional. <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir. 2001).

Obesity was deleted from the Commissioner's listing of impairments, effective October 25, 1999. 64 Fed. Reg. 46122 (1999). Obesity, however, remains a factor to be considered by the ALJ in making a disability determination, and specifically when determining the RFC of a claimant who has respiratory impairments. Social Security Ruling 02-01p, 2000 WL 628049, at *7 (Sept. 12, 2002) (when obesity is identified as a

medically determinable impairment, functional limitations associated with it must be considered when determining the RFC of claimants with musculoskeletal, respiratory, and cardiovascular problems).

An ALJ's failure to discuss obesity in assessing a claimant's RFC is not necessarily fatal.  In <u>Forte v. Barnhart</u>, 377 F.3d 892, 896 (8th Cir. 2004), for example, the Court held that the ALJ's failure to consider obesity in determining that the plaintiff could perform sedentary work that would allow alternate sitting and standing, did not warrant reversal where the plaintiff's treating physician repeatedly reported that the plaintiff was obese, but nonetheless believed he could perform light work.

Plaintiff suggests that the ALJ erred in not finding that he had nonexertional limitations resulting from obesity.  He cites to SSR 02-1p, which provides that a claimant with obesity "may" have certain problems.  However, Plaintiff points to no evidence in the record that his obesity causes him any limitations other than the limitations that were assigned by the ALJ.  <u>See</u> <u>McCarty v. Astrue</u>, Civil No. 09-715-GPM, 2011 WL 902493, *4 (S.D. Ill. March 15, 2011) (finding that the ALJ did not err by not finding nonexertional limitations when there was no evidence in the record that the claimant's obesity caused such limitations).

The reasons given by the ALJ for discrediting Dr. Sandiford's assessments of Plaintiff's functional abilities to the extent that the assessments precluded Plaintiff from performing light work, are supported by the record.  Plaintiff's own description of his past work fell within the light work range.  There is no indication that his physical

condition deteriorated after he stopped working.  In fact, the record suggests that his obesity and COPD improved since that time.

The record also indicates that Plaintiff's problems with fatigue and sleep apnea were controlled with treatment.  "Impairments that are controllable or amenable to treatment do not support a finding of total disability."  Johnson v. Apfel,  240 F.3d 1145, 1148 (8th Cir. 2001).  Between January 8, 2004 and July 13, 2007, Platintiff's sleep apnea was being successfully re-titrated with CPAP therapy, and Plaintiff tolerated the CPAP well and with no complaints.  Plaintiff reported waking up more rested and that he suffered less fatigue.  (Tr. 162-66, 177-78, 312-13.)  On January 23, 2008, Plaintiff reported to Dr. Park that the CPAP machine improved his sleep quality and daytime fatigue.  (Tr. 210-13.)  On May 29, 2008, Plaintiff reported that the CPAP titration was controlling his sleep apnea and that he was not having problems with excessive daytime sleepiness.  Dr. Sandiford also noted that Plaintiff was "free of wheezes" on examination.  (Tr. 306-08.)  On December 4, 2008, after complaining to Dr. Sandiford of excessive daytime sleepiness, Plaintiff underwent a CPAP titration study, which determined a new pressure setting for Plaintiff's CPAP device.  (Tr. 619-23.)  Finally, on January 27, 2009, when Plaintiff complained of daytime sleepiness, Dr. Sandiford resolved the issue by recommending a new mask for the CPAP device, because the old one was leaking.  (Tr. 617-18.)  Moreover, Plaintiff was able to work at the substantial gainful activity level while he was obese.  (Tr. 99, 119.)

The record therefore supports the ALJ's decision because there is no indication in the record that any nonexertional limitations would substantially reduce Plaintiff's ability

24

to perform activities of daily life or work functions.  The Court therefore finds Plaintiff's argument that the ALJ erred in determining Plaintiff's RFC because he omitted nonexertional limitations associated with obesity to be without merit.

**Side Effects of Medication**

Plaintiff argues that the ALJ erred in making his RFC determination, by failing to analyze, or even mention, the side effects associated with Plaintiff's medications when assessing Plaintiff's credibility regarding his symptoms.

In assessing the credibility of a claimant, the ALJ is required to examine and to apply the factors from Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) or from 20 C.F.R. § 404.1529.  The factors include: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the claimant's pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions.  Id.; O'Donnell v. Barnhart, 318 F.3d 811, 816 (8th Cir. 2003).

A review of the record indicates that the ALJ did mention Plaintiff's use of an inhaler and noted that Plaintiff responded well to the treatment.  (Tr. 20.)  Also, while Plaintiff alleges that the ALJ did not consider the side effects of his medications, Plaintiff has not pointed to any evidence in the record that demonstrated any such functionally limiting side effects.

The Eighth Circuit has held that while the Polaski factors must be taken into account, the ALJ does not need to recite and discuss each of the factors in making a credibility determination.  Casey v. Astrue, 503 F.3d 687, 695 (8th Cir. 2007).

Moreover, "[a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered."  Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).

The Court therefore finds Plaintiff's argument that the ALJ erred in failing to analyze or mention the side effects associated with Plaintiff's medications when assessing Plaintiff's credibility regarding his symptoms to be without merit.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.


_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 31st day of March, 2011.